AUDIT COMPANY, Appellee, v. A. S. KIRKHART, Appellant.

**PRINCIPAL AND SURETY:** Discharge of Surety—Surrender of Collateral. A surety is in no degree released by the surrender by the payee of illegally pledged collateral, of which pledge the surety had *no knowledge* when he signed as such surety.

*Appeal from Des Moines Municipal Court.*—H. H. SAWYER, Judge.

DECEMBER 11, 1924.

ACTION at law on an $800 note, tried without a jury. Court found for plaintiff, and rendered judgment against defendant for the amount due on the note. Defendant appeals.—*Affirmed.*

*Clark & Byers,* for appellant.

*Gillespie & Canfield,* for appellee.

ARTHUR, C. J.—I. The petition was the ordinary one for recovery on a promissory note. The note was signed by J. L. Livingston and defendant, A. S. Kirkhart. Livingston was not sued. The note had a collateral security clause in it, reciting

that a certain liberty bond of $600 had been deposited with the payee, to secure payment of the note. The Capital City State Bank of Des Moines was the payee, and the note was assigned by it to the plaintiff herein.

The answer admitted the execution of the note, but alleged that defendant was surety only; admitted indebtedness on the note to the extent of the difference between the amount thereof and the value of the collateral. The answer averred that, if said collateral had been released by the payee to some third party, as he understood it had been, defendant was entitled to a credit on said note in the amount of the value of said collateral. The answer further alleged that defendant was entitled to an assignment of the note in suit upon the payment of the balance due upon said note, after giving him credit for the value of the collateral.

In a reply, plaintiff alleged that the liberty bonds put up as collateral with the note, were claimed by Mrs. E. M. Livingston, wife of J. L. Livingston, as her property, and that the payee, after investigating the ownership of said bonds, returned said bonds to Mrs. Livingston.

II. As disclosed by the record, the genesis of the note in suit is substantially as follows: That, for some years prior to the execution of the note in suit, the signers of the note, A. S. Kirkhart and J. L. Livingston, were partners, engaged in the operation of what was known as the K. & L. Grocery Company and the K. & L. Mercantile Company. On July 29, 1919, Livingston borrowed $400 from the Capital City State Bank, giving his note therefor, signed by A. S. Kirkhart as surety. Sometime prior to August, 1920, Kirkhart and Livingston borrowed $1,000 for partnership purposes from the Capital City State Bank, executing their joint note therefor. Thereafter, Kirkhart and Livingston paid $500 on the $1,000 note, and Livingston paid $100 on the $400 note. On August 19, 1920, Kirkhart and Livingston gave their joint note to the bank in renewal of the unpaid balance of $500 on the $1,000 note above mentioned. On January 1, 1921, a note for $300 was given, to renew the unpaid balance of $300 on the $400 note above mentioned, signed by both Livingston and Kirkhart. On April 1, 1921, A. S. Kirkhart and J. L. Livingston executed their

joint $800 note, and took up the above mentioned $500 and $300 notes. Thereafter, on December 10, 1921, said $800 note was renewed by the execution of the note sued on. When the note in suit was given, the bank asked of Livingston collateral security. The liberty bonds in the amount of $600 mentioned in the note were already in the bank for safe-keeping, and Livingston told the bank that they might hold said bonds as collateral security. It is without dispute that the bonds were owned by Mrs. Livingston, and that she always called at the bank when interest became due on the bonds, and cut the coupons and deposited them to her individual savings account in the same bank. The bonds were accepted by the bank as collateral to the note, without any knowledge that Livingston had no right to pledge the same. Kirkhart did not know of the bank's request for security, or that Livingston had put the bonds up as collateral, until sometime thereafter. Mrs. Livingston did not know of the pledge of the bonds until about the time the notes in suit became due. She then made demand upon the bank for the return of the bonds, and the bank, after investigating her claim, came to the conclusion that it had no legal right to hold the bonds, and released them without the consent or knowledge of Kirkhart. Kirkhart and Livingston dissolved partnership in the summer of 1921.

Livingston testified that he and Kirkhart entered into an agreement, in the summer of 1921, on dissolution of their partnership, that, if he would deed a certain lot which he owned in Gilmar Park to Kirkhart, and turn over to Kirkhart all his interest in their two businesses, Kirkhart would assume and pay all of the liabilities of said two companies, including the $800 note, dated April 1, 1921, which note had been given to take up the prior notes of $500 and $300; that, in accordance with such agreement, he conveyed to Kirkhart the Gilmar Park lot; and that, from that time on, Kirkhart took sole charge of the businesses, sold the Gilmar Park lot, and had never made any accounting or explanation to him thereafter about said businesses or said property; that, before the note in suit was executed, he and Kirkhart had made the agreement above mentioned, whereby Kirkhart had assumed and agreed to pay all the indebtedness evidenced by the notes for which the note in suit

was given in renewal; that he, Livingston, was a signer of the prior notes, and liable in so far as the bank was concerned; and that for that reason he signed the note in suit, relying on Kirkhart's agreement to pay the same and save him harmless from liability thereon; that he put up the liberty bonds which belonged to his wife, thinking that Kirkhart would soon pay off the note, when the bonds would be released; that Kirkhart told him that he had gotten something over $1,000 out of the lot in Gilmar Park.

Kirkhart testified that the original $300 note which he signed was, as between Livingston and himself, signed by him as surety for Livingston, and that he received none of the money; that, when he signed the note in suit, he knew nothing whatever about the bonds' being deposited, nor the ownership thereof; that, when Livingston conveyed to him the Gilmar Park lot, he took the deed to secure him for the indebtedness of Livingston to him; that he closed out the businesses; that he sold the lot for something like $900, and never made any accounting to Livingston.

Kirkhart did not contradict the testimony of Livingston, in substance that, on dissolution of their partnership, the businesses were turned over to him, and Livingston conveyed the Gilmar Park lot to him, and that it was agreed that he would pay all indebtedness, which included the indebtedness for which the note in suit was given.

III. The error complained of is that the court was wrong in holding that Kirkhart, appellant, was not discharged *pro tanto* by the bank's releasing the security, the liberty bonds, put up as collateral by Livingston. In the first place, the court was justified, under the evidence, in finding, as between the bank and Kirkhart, that Kirkhart was a principal on the note. Also, the court was justified in finding, under the evidence, that, as between Kirkhart and Livingston, Kirkhart was the principal debtor, and not a surety. In fact, the evidence shows that Livingston was the surety. Livingston was liable to the bank on the note, but he was not sued. The principal complaint of appellant seems to be the release of the collateral by the bank. Such complaint is not justified, in fact or in law. The undisputed evidence shows that Mrs. Livingston was the owner of

the liberty bonds which were put up as collateral, and the bank was justified in releasing them to her. In fact, the bank never became a legal holder of the bonds. The bonds had been placed in the bank by Mrs. Livingston for safe-keeping, and she regularly appeared at the bank to cut the interest coupons and deposit them in her own name. Livingston had no authority to pledge the bonds. When Livingston told the bank that it might hold the bonds as collateral security, he made no claim of ownership of the bonds, but did not state that his wife owned them, and the bank made no inquiry about who owned the bonds, at the time. After Mrs. Livingston informed the bank that she owned the bonds, the bank investigated the matter, and learned the true fact,—that she did own the bonds. Upon gaining such information, the bank was fully justified in releasing the bonds to her. The trial court was right in holding that the bank did not breach its legal duty in returning the liberty bonds to Mrs. Livingston, the party owning them.

This being a law action, it is not our province to try the case anew on this appeal. We do not find in the record any error prejudicial to appellant.

Results in affirmance.—*Affirmed.*

EVANS, PRESTON, and FAVILLE, JJ., concur.